UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
                                         :                11 Civ. 7968 (JPO)

IN RE AGNICO-EAGLE MINES LTD.     :

SECURITIES LITIGATION           :        MEMORANDUM AND

                                           :                  ORDER
----------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

      Plaintiffs brought this securities fraud class action on behalf of all persons and entities

who purchased or acquired Agnico-Eagle Mines Ltd.'s publicly traded securities in the United

States or on a domestic exchange between July 28, 2010 and October 19, 2011 (the "Class

Period").[1]  The Consolidated Securities Class Action Complaint alleges that the defendants

issued materially false and misleading statements concerning one of their gold mines.  The

defendants have moved to dismiss the complaint, arguing that Plaintiffs fail adequately to plead

facts supporting a strong inference of scienter and that the challenged statements are not

actionable.  For the reasons that follow, that motion is granted.

**I.**     **Background**[2]

      On March 9, 2010, Defendant Agnico-Eagle Mines Ltd. ("Agnico") conducted a "mega

blast" at Goldex Mine ("Goldex").  On October 19, 2011, Agnico made a "shock announcement"

that it was suspending all mining operations and gold production at Goldex because structural

---

[1] Första AP-Fonden was appointed Lead Plaintiff on February 6, 2012.  (Dkt. No. 38.)

[2] The factual background reflects the allegations in the Complaint, which are presumed to be true
for purposes of this motion.  In deciding a motion to dismiss, a court "may consider any written
instrument attached to the complaint, statements or documents incorporated into the complaint
by reference, legally required public disclosure documents filed with the SEC, and documents
possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI
Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The Court
accordingly considers Defendants' exhibits, all of which fall within the terms of this rule.

issues threatened the mine's safety and stability. The value of Agnico stock dropped nearly 25% within two days of that announcement, wiping out approximately $2.2 billion of shareholder equity. In this case, Plaintiffs allege that Agnico, Agnico's Chief Executive Officer Sean Boyd, and Agnico's former President and Chief Operating Officer Eberhard Scherkus (collectively "Defendants") violated the federal securities laws through a series of false statements and omissions of material fact about the evolving situation at Goldex.

### A. Agnico and the Goldex Mine

Agnico is a Canadian-based gold producer with mining operations spread throughout the world. (Compl. at ¶¶ 20, 25.) It trades on the New York Stock Exchange and the Toronto Stock Exchange, and boasts a history of "over three decades of continuous gold production, primarily through underground operations." (*Id.* at ¶ 24.) Goldex is an underground gold mine located in Val d'Or, Quebec and operated by Agnico. (*Id.* at ¶¶ 20, 37.) Specifically, Goldex is located in the Abitibi Region, where Agnico owns two additional mines (LaRonde and Lapa), and is leased from the Quebec Ministry of Natural Resources and Wildlife. (*Id.* at ¶¶ 25, 37.)

Agnico pursued a growth strategy during the 2000s based on acquisition of gold mines in mining-friendly jurisdictions (*id.* at ¶ 26), but the Abitibi mines still accounted for 47% of its 2010 gold production (*id.* at ¶ 27). Specifically, in 2010 and 2011, Agnico acquired or announced its intent to acquire interest in at least five early-stage mining projects. (*Id.* at ¶ 11.) "During 2010 and 2011, the Company took pains to keep itself highly liquid for such acquisitions, filing a base prospectus for an offering of up to $500 million, restating a $1.2 billion credit facility, and entering into a $600 million private placement note offering to reduce amounts outstanding on the Company's credit lines." (*Id.*)

2

Because Goldex contains low grade gold deposits, and is located close to residential populations and critical infrastructure, Agnico relied upon a high-volume mining method called "bulk mining." (*Id.* at ¶¶ 37-40.) Accordingly, the mine was divided into a number of zones located at different depths. (*Id.* at ¶ 41.) The largest and most economically significant zone is called the "Goldex Expansion Zone" (GEZ), and is located 450 to 790 meters below the Earth's surface. (*Id.*) A combination of technological and commercial concerns led Agnico initially to decide against mining Goldex, but a steep climb in the value of gold and the development of innovative mining methods led Agnico to reconsider in 2005. (*Id.* at ¶¶ 43-49.) That year, Agnico approved a feasibility study and construction to enable production at Goldex. (*Id.* at ¶ 50.) The final strategy borrowed from familiar mining methods to create a "novel and aggressive open stope mining method." (*Id.* at ¶ 51.) Goldex began commercial gold production in August 2008. (*Id.* at ¶ 55.)

In 2009, the Agnico Annual Report stated that "[t]he Company is largely dependent upon its mining and milling operations at the LaRonde Mine and the Goldex Mine." (*Id.* at ¶ 28.) Goldex accounted for 30% of Agnico's gold production in 2009 and then 17% of total production in 2010—at which point it remained Agnico's top-producing mine. (*Id.*) Goldex also enjoyed superior efficiency, leading Boyd to describe it as Agnico's "best net free cash flow generator" and the source of "about $200 million in free cash flow in 2011." (*Id.*) Defendants repeatedly touted Goldex's value in conference calls and public filings (*id.* at ¶ 29), and acknowledged its value to Agnico in public statements after closing the mine (*id.* at ¶ 30). Boyd chose to "highlight Goldex" when asked about his "favourite" mine in April 2011 and Boyd described it as his "baby." (*Id.* at ¶ 31.) Defendants set "stretch" targets at Goldex, generating pressure on its managers to meet public production forecasts. (*Id.* at ¶¶ 32-36.)

3

**B.      From the March 2010 Blast through mid-July 2010**

In September 2009 and then in January 2010, Agnico triggered mega blasts at Goldex to dislodge large amounts of rock.  (*Id.* at ¶ 55.)  On March 9, 2010, Agnico set off a mega blast of 1.8 million metric tonnes of ore, which according to the Australian Center for Geomechanics "may well be considered a world record for underground mining."  (*Id.* at ¶ 56.)  The blast was larger than expected and unexpectedly hit a shear zone—a discontinuity in the rock surface— located outside the intended caving zone.  (*Id.* at 57.)  As a result, the surface soil above the mine bedrock began to subside, or sink into the ground, due to a drop in the local water table as water entered the mine.  (*Id.* at 57.)  Pumps were used to remove some of this water.  (*Id.*)

By April 2010, Agnico's seismic monitoring system detected a heightened level of microseismicity around two of the partially extracted stopes at Goldex.  (*Id.* at ¶ 60.)  According to records of a Val d'Or neighborhood council meeting dated May 4, 2010, home and business owners near Goldex soon experienced a variety of water-related problems.  (*Id.* at ¶¶ 61, 64.)  Agnico arranged for property owners to be connected to Goldex's water supply.  (*Id.* at ¶¶ 63, 91.)  As the surface subsided, some Goldex infrastructure sustained damage, resulting in emergency repair work by a third-party company that provides contracting services to Goldex.  (*Id.* at ¶ 65.)  A number of local witnesses report that Highway 117, located near Goldex, was damaged (and closed on a few occasions) by the post-blast subsidence.  (*Id.* at ¶ 68.)

**C.      The Class Period:  July 28, 2010 through October 19, 2011**

**1.      Further Developments at Goldex**

On July 28, 2010, Agnico issued a press release announcing its second quarter 2011 earnings.  (*Id.* at ¶ 108.)  The release indicated that Goldex was operating at "steady state," noted an increase in the mining rate, and forecasted that the "life of mine average gold production is

expected to be approximately 168,000 ounces per year through 2017." (*Id.*)  The next day, Agnico held a conference call with investors in which Boyd referred in part to Goldex when he stated that "we will expect additions to our [gold] reserve base from our existing projects." (*Id.* at ¶ 110.)  Scherkus noted that Goldex had won "safety awards" and explained that Agnico adopts a policy of transparency with respect to safety concerns. (*Id.* at ¶ 112.)  On September 22, 2010, Agnico released a "Corporate Update" describing steady state operation and discussing continued exploration of Goldex. (*Id.* at ¶ 115.)

On October 27, 2010, Agnico issued a press release heralding the near-completion of expansion at Goldex, "Record Production and Good Cost Control" at the mine, and improvement in production and costs. (*Id.* at ¶ 116; Def.'s Ex. B.)  The report noted that "the final production blast for the current orebody is scheduled for late 2010 (to be followed by approximately seven years of extraction).  As a result, the focus has shifted to exploration and potentially extending the mine life by adding nearby zones . . . into the mine plan." (*Id.*)  The release was followed by similarly optimistic conferences calls and PowerPoint presentations. (*Id.* at ¶¶ 118-19.)  On December 15, 2010, Agnico produced an update on its exploration program.  Agnico stated that it was conducting exploratory drilling—primarily focused on the "D" zone, which is located 150 meters below GEZ—at an estimated cost of $5.8 million. (*Id.* at ¶ 122; Def.'s Ex. C.)

On February 16, 2011, Agnico issued a release announcing its fourth quarter and full year 2010 financial results. (Compl. at ¶ 123; Def.'s Ex. D.)  Boyd described "record gold reserves and record annual financial and operating results." (Def.'s Ex. D.)  Addressing Goldex, the release noted "strong tonnage performance due to . . . an increase [in] the capacity of the mill," stated that "Agnico-Eagle believes this is one of the lowest cost hard rock underground mines in the world on a minesite cost per tonne basis," described "improved performance . . . reflective of

the ongoing optimization efforts at the mine and improved thoroughput," and concluded that "the mine life of Goldex may be extended as the deeper D Zone is explored and quantified." (*Id.*) The press release was accompanied by a positive PowerPoint presentation that described Agnico's "low-risk strategy for strengthening our gold mining business and creating shareholder value." (Compl. at ¶ 124.) The Annual Report filed on March 28, 2011 described "record gold reserves," specifically mentioning that "[t]he synergies between [the Goldex, LaRonde, and Lapa] sites contribute to the Company's status as a low-cost producer." (*Id.* at ¶ 126.) That same day, Agnico filed a management Discussion and Analysis for 2010 in which it described how "[a]t the Goldex Mine, which is located in close proximity to residential communities, the Company has developed effective control, monitoring and public information tools to manage the effects of large underground production blasts." (*Id.* at ¶ 128.)

On the basis of testimony by confidential witnesses (CWs), Plaintiffs allege that Agnico stopped new drilling at Goldex in February or March 2011, hired an outside consulting firm to repair damage wrought by the March 2010 blast, and undertook significant remediation efforts. (*Id.* at ¶¶ 70, 71, 73.) According to a Quebec Environmental Ministry engineer, Agnico sought and received approval from the Quebec Environmental Ministry for these remediation activities. (*Id.* at ¶ 72.)

In March 2011, Agnico triggered another blast in the GEZ. (*Id.* at 69.) That same month, according to a Quebec Environmental Ministry engineer, Agnico launched a significant Goldex remediation effort. (*Id.* at ¶ 80.) This program, however, soon failed. (*Id.*) CW 1, a third-party contractor and supplier for Goldex, also states that the remediation efforts quickly stalled. (*Id.*)

On April 28, 2011, Agnico issued a press release announcing the discovery of "significant extensions of gold mineralization" at Goldex and confirming that "[t]his year's

exploration program is on track to achieve the 2011 goal of more than 22 million ounces of gold reserves." (*Id.* at ¶ 132.)  An accompanying PowerPoint presentation reaffirmed Agnico's low-risk strategy (*id.* at ¶ 133), and in a conference call the next day, Boyd described a "growth phase" and noted that Agnico "is a very steady-state producer" (*id.* at ¶¶ 134-36).

On May 10, 2011, representatives from Goldex spoke at a Val d'Or neighborhood council session and reported that Agnico was "currently working to stabilize and secure the land." (*Id.* at ¶ 74.)  In June 2011, Agnico started purchasing neighborhood properties that had been affected by subsidence.  (*Id.* at ¶ 76.)

### 2.      The July 27, 2011 Press Release

On July 27, 2011, Agnico issued its first press release to reference expressly the developments at Goldex.  (*Id.* at ¶139; Def.'s Ex. F.)  In relevant part, the press release stated: "Grouting of a shear zone is underway to reduce water inflow to the underground mine.  This water flow has caused soil settlement issues at the minesite as previously saturated soils around the minesite are draining.  However, flow rates have been controlled as remediation continues." (Def.'s Ex. F.)  The release also noted success in the D Zone project at Goldex and stated that Agnico "expects to deliver a strong second half operationally, with gold production anticipated to increase approximately 20% over the first half of 2011."  (Compl. at ¶ 140.)  A PowerPoint released that same day reiterated Agnico's low-risk strategy and pegged Goldex's expected life at eight years.  (*Id.* at ¶ 142.)  On a conference call the next day, Scherkus stated:

> I would just like to talk a bit about the surface subsidence issue.  About 4 months ago, we blasted on the [GEZ], and we re-hit a shear zone that lies above the eastern part of the [GEZ] and that has been the source of water.  We started getting an increase of water from another blast little over a year ago and that was the major blast.  So we started getting some infiltration.

7

Goldex is a historically dry mine.  And so it's not equipped to handle a lot of water, unlike some of our other mines at Pinos Altos and even Kittila.  So we started getting some water inflow and that inflow gradually increased over the year.  So the impact of that water inflow, it lowered the water table and the overburden on top of the deposit.

And the overburden averages up anywhere from above the 75 feet to 150 feet in thickness.  So our program of mitigating this issue consists of grouting the shear zone to prevent the water from inflowing into the mine, reinjecting water to restore the water table and then also increase our pumping capacity in the event that we're not able to totally seal off the shear zone.  So far, we have had – it's still very early, but we have had some initial good results.

Our pumping capacity has been increased significantly.  So as a result, we have started to reinject our water table, water into the water table, and the early results are positive where subsidence, or the rate of subsidence, has declined.  At no point or anywhere is the water table or the orebody in jeopardy.  We have been pumping water and yet we have been able to establish record tonnage in May and in June . . .

[W]e've only spent $6 million of [remediation funds] so far.  But we have taken a provision to continue this program to make sure that we complete it from now to the end of the year.  But, we will be doing more grouting, more injection and then also we will be pumping.  So we'll keep you posted if there are any more changes.  But so far, the initial results have been positive.

(*Id.* at ¶ 62; 143; Def.'s Ex. M.)  He added: "[G]oing forward, we expect with a 20% increase in our production, approximately in the second half . . . [a]nd as a result of more production, we should see a bump in our cash flow as we move forward."  (Compl. at ¶ 144.)  In response to questions, Scherkus described the size of the subsidence area, noting that "we've already acquired some of the houses" impacted by the subsidence.  (*Id.* at ¶ 146.)  He also described the remediation plan, concluding with the following characterization:

[W]e have an overall budget now of about $19 million.  And we have spent $6 million.  We still have a lot of grouting to do . . .

But to accelerate [our two tiered approach], we have got wells drilled and we are injecting water.   And what we have found, the moment we inject water, subsidence slows down almost immediately.  So we'd like to make sure we sealed

8

> it.  And worst comes to worst, we'll just inject water into the water table and it'll
> be a net benefit.  A zero-zero.  And the subsidence should stabilize.

(*Id.* at ¶ 147.)  In response to a question about anticipated capital expenditures, Scherkus stated that "[t]he subsidence issue at Goldex which is a large ticket item, once that water inflows is resolved, that's a one-time item as well."  (*Id.* at ¶ 149.)

### 3. August and September 2011

By August 2011, Agnico had to prop up infrastructure to prevent instability resulting from the subsidence.  (*Id.* at ¶ 85.)   A Quebec Environmental Ministry report based on an investigation in August 2011 noted:  "Every week, all structures are inspected by land surveyors and structure specialists.  The ground is not stable and represents a risk for the structures.  The company could not answer the question if the surface foundation was stable or if there was any risk of a collapse."  (*Id.* at ¶ 88.)

On August 18, 2011, Agnico presented a technical report on its operations, including its operations at Goldex.  (*Id.* at ¶¶ 87, 154.)  The update noted "record tonnage" milled at Goldex "despite soil subsidence issues" and added that positive results in Zone D "could significantly increase mine life."  (*Id.* at ¶ 154.)  The report referenced only "surface overburden subsidence" and "water inflow and soil subsidence."  (*Id.* at ¶ 155.)

On September 20, 2011, four Goldex representatives discussed with the Val d'Or neighborhood council the "work performed and the additional steps to be taken to stabilize the ground" at Goldex.  (*Id.* at ¶ 90.)  Several CWs report that Goldex representatives visited and made payments to certain local residents in September 2011 to connect them to the Goldex water supply as their wells dried up.  (*Id.* at ¶ 91.)

### 4.      The October 11, 2011 and October 19, 2011 Disclosures

On October 11, 2011, Agnico issued a press release announcing a "Program Underway for Assessment, Monitoring and Remediation of Water Inflow and Subsidence Issue."  (*Id.* at ¶ 92.)  In relevant part, Agnico stated:

> The Goldex mill processed an average of 8,222 tonnes per day ("tpd") in the third quarter of 2011 as compared with 8,448 tpd in the second quarter of 2011.  The mine and mill continue to run at capacity.

> Gold production in the third quarter of 2011 was 40,224 ounces.  This compares with the second quarter of 2011 when the payable gold production was 41,998 ounces. The decrease was largely due to the slightly lower throughput combined with slightly lower grades.

> As previously announced, the grouting of a weaker, fractured, volcanic rock unit in the eastern end of the hangingwall of the deposit is underway. The purpose of the grouting program is to reduce the water inflow to the underground mine.  This water flow has caused ground settlement issues at the minesite as previously saturated soils are draining into the mine and lowering the water table.  To date, movement has been observed in the mill building and in the headframe.  However, water flow rates have been controlled as remediation continues. The mine and processing facility continue to operate normally while remediation efforts are expanded.

> While the Company's underground instrumentation shows that the volcanic rock mass above the Goldex orebody is stable, the Company has received an opinion from a rock mechanics consultant that suggests that water inflow has negatively impacted the integrity of the rock mass.  As a result, the Company is undertaking further assessment of the stability of the rock mass and is increasing its efforts to decrease water inflow and the potential negative effects of the water on the rock mass.  The Company's expanded grouting and monitoring program includes:

> - Drilling from surface to investigate the area around the eastern end of the deposit for water flow and possible rock subsidence

> - Drilling from underground into the volcanic rock unit to determine whether additional fracturing and movement in the rock mass has occurred

> - Grouting with six larger drills.  Targeting the rock between 80 metres and 100 metres below surface over an area at the eastern end of the deposit to stop or reduce the water inflow

10

- Installing additional instrumentation to monitor for any soil and rock movements

- Installing additional excess pumping capacity to ensure that increased water flows can be dealt with, should the need arise

The program will be reassessed on a three month basis to determine whether additional remediation work or changes in the mining plan are warranted.

The initial budget for remediation of this subsidence issue was C$20 million through 2011.  As a result of the expanded program, the Company anticipates that 2011 expenditure will total approximately C$25 million.

(Def.'s Ex. G.)  Agnico's stock price remained stable after this disclosure.  (Compl. at ¶ 163.)

On October 19, 2011, Agnico issued a release announcing its decision to shut down the Goldex mine effective immediately.  (*Id.* at ¶ 93; Def.'s Ex. H.)  Agnico downgraded the Goldex reserves to "mineral resources" and wrote off the mine's book value, stating that the decision followed the "receipt of an opinion from a second rock mechanics consulting firm which recommended that underground mining operations be halted until the situation is investigated further."  (Def.'s Ex. H.)  The release added:

In the past week, rock subsidence has been confirmed above the north-eastern limit of the deposit.  The exact location and extent of this subsidence is unknown and remains to be determined by diamond drilling and other methods. However, as a result of these findings, previously planned grouting and water re-injection efforts have been suspended and work will be reoriented to preserve the surface infrastructure in the area.

(*Id.*)  Scherkus clarified that this second opinion had been received on October 13, 2011.

(Compl. at ¶ 165.)  That day, Agnico held a conference call in which Scherkus stated:

[I]n March of 2010[,] we had one of the final blasts on the eastern part of the Goldex extension zone, the eastern stope, and with that we had sloughing, and the sloughing was in granite, and it was pretty much as expected. However, what did happen is it continued to slough as we continued to muck, and that sloughing over time broke through into the volcanics, into the hanging wall, and as a result of that, we started to get a slow infiltration of water, and we had graphs where we monitored our pumping capacity, and we saw a gradual increase of water, and

what the water also did was to wash out any silt or dissolve any other minerals that may have been in there, and all of a sudden the flow increased over time. So once the flow increased, we started getting a lower water table over the last, I would say over the last year, 15 months….

(*Id.* at ¶ 167.)  He elaborated that Agnico's consultants had adopted two different views of how to ameliorate the subsidence issue at Goldex, that it had been an "ongoing process," and that Agnico had passed data to its consultants "not expecting to come back with a recommendation of this magnitude."  (*Id.* at ¶ 172.)  Analysts responded negatively to these disclosures (*id.* at ¶ 169), as did the market, prompting a two-day 23.56% drop in the value of Agnico stock—a total loss in market capitalization of over $2.2 billion (*id.* at ¶ 170).

October 19, 2011 also witnessed several other relevant statements.  The assistant general manager of Goldex noted that "[t]he employees have been aware of this rather delicate situation for a year now."  (*Id.* at ¶ 66.)  An article in *L'Echo Abitibien* reported that, according to the General Manager of Goldex, Agnico had been in negotiations with local residents since "last spring" to buy their properties as a result of subsidence-related issues.  (*Id.* at ¶ 74.)  This article quoted Scherkus as stating that "it could well be that over time the vibrations [of the blasting] weakened the granite, and the volcanic rock above it, which would have caused underground water seepage over the course of an entire year."  (*Id.* at ¶ 94.)  The *Abitibi Express* reported that a survey in May 2011 had confirmed that volcanic bedrock—not just the surface—had been affected by the seeping water.  (*Id.* at ¶ 75.)  Scherkus was quoted in *Agence QMI* as stating that "[f]or around 15 months, we have noticed water seeping in."  (*Id.* at ¶ 95 n.12.)

### D.     Post-Class Period Statements and Developments

On October 25, 2011, the Quebec Environmental Ministry released an Inspection Report based on an August 23, 2011 inspection of Goldex ("the Report").  (*Id.* at ¶ 174.)  The Report

described "ground settling" and the "infiltration of water," adding that these problems "ha[d] been an issue for the last two years." (*Id.*) The Report added that "[t]he ground is not stable and represents a risk for the [mine's] structures" and that "[t]he company could not answer the question if the surface foundation was stable or if there was any risk of collapse." (*Id.*) On October 27, 2011, Scherkus stated on a conference call that as of "last spring," when Agnico passed data to consultants for analysis, "all we were trying to do was stabilize the roads, stabilize the buildings." (*Id.* at ¶ 74.) He also stated that "there were situations where we could not get a drill hole through" while testing rock quality by drilling on the surface. (*Id.* at ¶ 82.)

On February 15, 2012, Scherkus retired from Agnico after twenty-six years with the company. On a conference call the next day, Boyd said of Scherkus that "Goldex was his baby." (*Id.* at ¶ 179.) Throughout the Class Period and afterwards, Boyd and Scherkus regularly spoke about Goldex on calls with investors. (*Id.* at ¶ 183.) On February 27, 2012, Boyd described Agnico's use of stretch targets at Goldex, noting that Scherkus adopted that approach and clarifying that failure to meet these targets during the Class Period would have affected compensation. (*Id.* at ¶¶ 195-98.) Boyd and Scherkus maintained annual incentive compensation arrangements throughout the Class Period, comprised of option-based awards and annual incentives plans. (*Id.* at ¶ 201.) During the Class Period, Boyd earned $24.4 million in total compensation and Scherkus earned $18.0 million in total compensation. (*Id.*)

At some point after the Class Period, Boyd stated that Goldex was "one of our lowest cost producers, generating cash profit of almost $50 million" and added that "Goldex required very little capital, very little sustaining and ongoing underground development." (*Id.* at ¶ 178.)

Throughout the Class Period—indeed, throughout a period ranging from March 2010 to September 2011—Agnico presented itself to the public as a growth company heavily focused on

expansion of its gold reserves and lost-cost production.  (*Id.* at ¶¶ 189-192.)  In 2010 and 2011, Agnico acquired or announced its intent to acquire five new mining ventures, ranging in price from $1 million to C$70 million.  (*Id.* at ¶ 193.)  Plaintiffs allege that this "growth-through-acquisition-and-development strategy" required large amounts of liquidity and maintenance of high stock value for use as consideration.  (*Id.* at ¶ 194.)  For example, Agnico acquired Grayd Resources Corp. in a stock-for-stock transaction on October 13, 2011—though this deal was later restructured in light of the drop in Agnico share value, such that Agnico's potential out-of-pocket costs increased from $92 million to $183 million.  (*Id.*)

## II.     Legal Standard

### A.     Motion to Dismiss

#### 1.     Pleading Requirements

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a motion to dismiss pursuant to Federal Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor."  *Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006) (quotations omitted).  That said, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (citation omitted); s*ee also In re NYSE*

14

*Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) ("We need not accord legal conclusions,

deductions or opinions couched as factual allegations . . . a presumption of truthfulness."

(citations and quotation marks omitted)).  In a recent summary of the plausibility standard, the

Second Circuit explained that:

> [T]he *Twombly* Court stated that a complaint attacked by a Rule 12(b)(6) motion
> to dismiss does not need detailed factual allegations, but mere labels and
> conclusions or formulaic recitations of the elements of a cause of action will not
> do; rather, the complaint's factual allegations must be enough to raise a right to
> relief above the speculative level, i.e., enough to make the claim plausible.

*Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations and quotation marks

omitted).

## 2.    Securities Fraud

"A complaint alleging securities fraud pursuant to Section 10(b) of the Securities

Exchange Act is subject to two heightened pleading standards."  *In re Gen. Elec. Co. Sec. Litig.*,

857 F. Supp. 2d 367, 383 (S.D.N.Y. 2010), *reconsideration granted in part*, 856 F. Supp. 2d 645

(S.D.N.Y. 2012).  These heightened pleading requirements are defined by Rule 9(b) and by the

Private Securities Litigation Reform Act of 1995 (PSLRA).

First, "[a] complaint alleging securities fraud must satisfy Rule 9(b)'s requirement that

'the circumstances constituting fraud . . . be stated with particularity.'"  *Gissin v. Endres*, 739 F.

Supp. 2d 488, 500 (S.D.N.Y. 2010) (quoting Fed. R. Civ. P. 9(b)).  "This pleading constraint

serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from

improvident charges of wrongdoing, and protect him against strike suits."  *ATSI*

*Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting *Rombach v.*

*Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).  A securities fraud plaintiff must therefore "'(1)

specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3)

15

state where and when the statements were made, and (4) explain why the statements were

fraudulent.'" *Rombach*, 355 F.3d at 170 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170,

1175 (2d Cir. 1993)).  Conclusory allegations are insufficient.  *See ATSI*, 493 F.3d at 99.

Second, "[t]he PSLRA requires plaintiffs to state with particularity both the facts

constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention

to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

313 (2007) (quotation marks omitted).  Plaintiffs must "state with particularity facts giving rise

to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–

4(b)(2).  "To qualify as 'strong' within the intendment of § 21D(b)(2) . . . an inference of scienter

must be more than merely plausible or reasonable—it must be cogent and at least as compelling

as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314; *see also id.* ("[T]o

determine whether a complaint's scienter allegations can survive threshold inspection for

sufficiency, a court governed by § 21D(b)(2) must engage in a comparative evaluation; it must

consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally

drawn from the facts alleged.").  "A complaint will survive . . . only if a reasonable person would

deem the inference of scienter cogent and at least as compelling as any opposing inference one

could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

### B.    Section 10(b) and Rule10b-5:  The Scienter Requirement

Plaintiffs' main securities claims are brought pursuant to § 10(b) of the Exchange Act, 15

U.S.C. § 78j(b).  This provision makes it unlawful to "use or employ, in connection with the

purchase or sale of any security . . . any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the Commission may proscribe." *Id.*  The SEC

rule that implements this provision, Rule 10b–5, prohibits "mak[ing] any untrue statement of a

16

material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).  "To state a claim under Rule 10b-5 for misrepresentations, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."  *ATSI*, 493 F.3d at 105 (citation omitted).

In this case, the parties contest whether the complaint adequately alleges (1) a false statement or omission of material fact, and (2) scienter.  Because the Court dismisses on the basis of scienter, its discussion is limited to that element.  A plaintiff adequately pleads scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000)); *accord Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 428 (S.D.N.Y. 2010).

### 1.    Motive and Opportunity

Motive can be "shown by pointing to 'the concrete benefits that could be realized' from one or more of the allegedly misleading statements or nondisclosures; opportunity [can] be shown by alleging 'the means' used and the 'likely prospect of achieving concrete benefits by the means alleged.'"  *S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 108-09 (2d Cir. 2009) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001) ("Motive is the stimulus that causes a person or entity to act or to fail to act.  Such stimulus ordinarily anticipates a concrete benefit defendant would realize by his conduct.").  "The motive and opportunity element is

generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." *Scholastic*, 252 F.3d at 74 (citing *Novak*, 216 F.3d at 307-08). "'Unusual' insider sales at the time of the alleged withholding of negative corporate news may [also] permit an inference of bad faith and scienter." *Id.* (citations omitted).

In contrast, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (citation omitted); *see also Chill v. General Electric Co.,* 101 F.3d 263, 268 (2d Cir. 1996) ("[A] generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter."). Accordingly, courts have repeatedly explained that the desire to increase officer compensation by inflating stock prices does not constitute motive. *See, e.g.*, *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("Plaintiffs' allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is without merit. If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."). So too "[t]he desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment." *S. Cherry*, 573 F.3d at 109 (citation omitted); *see also Ganino*, 228 F.3d at 170 ("General allegations that defendants acted in their economic self-interest are not enough." (citation omitted)); *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 570 (S.D.N.Y. 2007) ("Plaintiffs cannot support an inference of scienter by alleging that Defendants were motivated to engage in the alleged fraud in order to inflate the price of DRD's stock, maintain the appearance of profitability or raise capital.").

18

Inflation of stock prices to effectuate acquisitions presents a closer question.  The Second Circuit has concluded that "in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter."  *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000).  This rule, however, is interpreted narrowly.  Before grounding scienter on this manifestation of motive, courts ordinarily require evidence that the allegedly fraudulent inflation of stock prices was aimed at the specific acquisitions identified in the pleadings.  *See, e.g.*, *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) ("In this case, the link between the acquisition and the alleged misconduct simply is not close enough to strengthen the inference of an intent to defraud." (footnote omitted)); *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) ("Scienter may be imputed, as is the case here, to defendants when defendants' were motivated to inflate company stock prices as a means to effectuate a *specific* acquisition that would not otherwise be possible without fraudulently inflating stock prices" (emphasis added)).  Courts also recognize that inflation of stock value to compete more effectively in the acquisition market can redound to shareholders' benefit and thus figure within a general, non-fraudulent scheme of corporate growth.  *See, e.g.*, *Kalnit*, 264 F.3d at 141 ("[A]ny intent to defraud Comcast cannot be conflated with an intent to defraud the shareholders . . . . [A]chieving a superior merger benefitted all shareholders, including the defendants."); *DRDGOLD*, 472 F. Supp. 2d at 571 (explaining that inflation of stock value to generate capital for diversification of a company's assets would ordinarily indicate a "laudable desire . . . to protect shareholder investments" rather than an effort by officers to benefit themselves at the expense of shareholders); *Leventhal v. Tow*, 48 F. Supp. 2d 104, 115 (D. Conn. 1999) (holding plaintiff's allegations that defendants had a

motive to artificially inflate stock price to get more favorable terms in stock-for-stock transactions and debentures were too generalized to establish scienter).

### 2.    Conscious Misbehavior or Recklessness

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (citations and quotation marks omitted).

"To survive dismissal under the 'conscious misbehavior' theory, [plaintiffs] must show that they alleged reckless conduct by the [defendants], which is 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Honeyman v. Hoyt (In Re Carter–Wallace, Inc. Secs. Litig.)*, 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted)).  Courts have also described reckless conduct as "[a]n *egregious* refusal to see the *obvious,* or to *investigate the doubtful*," *Chill*, 101 F.3d at 269 (citation omitted), and "reckless disregard for the truth . . . a state of mind *approximating actual intent,* and *not merely a heightened form of negligence*," *S. Cherry*, 573 F.3d at 109 (quotation marks omitted) (emphasis in original).  This form of scienter can also be demonstrated by evidence of "knowing falsity." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009)

Thus, in securities fraud cases, plaintiffs may demonstrate conscious behavior or recklessness by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308.  "Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting

material facts related to the corporation." *Id.* "[T]he burden remains on the plaintiff to set forth the specific reports, information or other indicia of fraud that rendered the defendants' conduct 'highly unreasonable, representing an extreme departure from the standards of ordinary care.'" *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 481 (S.D.N.Y. 2008) (citations omitted); *accord In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272-73 (S.D.N.Y. 2009) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information to indicate how it was inconsistent with the statements made." (citation omitted)).  A "'pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent' is insufficient to 'support the inference that the defendants acted recklessly or with fraudulent intent.'"  *Rombach*, 355 F.3d at 176 (quoting *Shields*, 25 F.3d at 1129).

The Second Circuit has "identified several important limitations on the scope of liability for securities fraud based on reckless conduct":

> First, we have refused to allow plaintiffs to proceed with allegations of "fraud by hindsight."  Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.  Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.
>
> Second, as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects.  Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.

*Novak*, 216 F.3d at 309 (internal citations omitted).

Three cases help illustrate these points.  In *Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995), the defendants—primarily a New York corporation with business throughout the

21

world—purchased a manufacturing plant in Kansas to manufacture a number of animal health

products.  *Id*. at 50.  An initial FDA inspection in 1990 revealed thirty-four deficiencies at the

Kansas plant.  *Id.*  A second inspection in April-May 1991 revealed fourteen deficiencies, though

the FDA did not impose any sanctions.  *Id.*  The defendants did not reveal these developments in

their public statements.  *Id.*  On January 17, 1992, the FDA produced a third report identifying

eighty-five deficiencies.  *Id.* at 51.  That day, one of the defendants agreed to suspend production

and sales of products produced in the Kansas plant.  *Id.*  He then notified the investing public on

February 18, 1992, a full month later.  *Id.*  The plaintiffs alleged securities fraud, arguing, *inter*

*alia*, that the defendants should have foreseen the negative consequences of the third inspection

and should have disclosed the results of the third FDA report sooner.  *Id.*  These arguments

failed.  Judge Miner explained that "[m]ere allegations that statements in one report should have

been made in earlier reports do not make out a claim of securities fraud . . . defendants' lack of

clairvoyance simply does not constitute securities fraud."  *Id.* (internal citations omitted).  He

added that the one-month delay did not constitute circumstantial evidence of reckless or

conscious misbehavior by the defendants suffice to support a finding of fraudulent intent.  *Id.*

     In *Slayton v. American Exp. Co.*, 604 F.3d 758 (2d Cir. 2010), investors filed a securities

class action alleging that American Express misled investors as to the extent of anticipated losses

as a result of its over-investment in high-yield debt securities.  After first-quarter losses of $182

million from high-yield debt investments, American Express publicly stated in April 2001 that it

expected further losses from those investments to be "substantially lower" for the remainder of

2001.  *Id.* at 762.  In early May 2011, two defendants (senior officials at American Express) were

surprised to learn that the risk of additional loss was higher than anticipated and that the

magnitude of the risk remained uncertain.  *Id.* at 763.  They then set two analysts to work on a

full risk assessment.  *Id.*  On May 15, 2011, American Express again stated that it expected total losses on those high-yield debt investments to be lower than in the first quarter.  *Id.*  The risk assessment was completed in early July 2001; it revealed, much to the defendant-officials' surprise, significant anticipated losses.  *Id.*  On July 18, 2011, American Express publicly announced that it would take an additional $826 million loss on these investments.  *Id.*

A securities fraud suit quickly followed.  Addressing the scienter requirement, which was modified by an applicable safe harbor provision to actual knowledge of falsity rather than knowing falsity *or* recklessness, the court concluded that the inference of non-fraudulent intent prevailed over the contrary inference.  *Id.* at 773, 775.  Judge Katzmann noted that the plaintiffs had not offered evidence to support directly their contention "that the defendants had reason to believe that the scope of the expected losses would be comparably large, i.e. that they had no basis to believe that the extent of the losses would be substantially lower than $182 million."  *Id.* at 776.  Further, Judge Katzmann observed that the evidence suggested that "the defendants engag[ed] in a good-faith process to inform themselves and the public of the risks" by preparing a risk assessment, informing the public shortly after discovering the total risk, and "endeavoring in good faith to ascertain and disclose future losses."  *Id.* at 777.  He explained that "[o]rdering an investigation as soon as they learned that the investment-grade CDOs might be deteriorating, and directing [analysts] to use conservative assumptions, was 'a prudent course of action that weakens rather than strengthens an inference of scienter.'"  *Id.* (quoting *Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 763 (8th Cir. 2009)).  Finally, he noted that "the losses reported in July were the product of using different assumptions . . . . These new assumptions and decisions undermine any inference that the defendants suspected the magnitude of losses reported in July when they made the May 15 statement."  *Id.*

Finally, in *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 564 (S.D.N.Y. 2007), investors alleged securities fraud where a gold exploration company (DRD) restructured its "North West Operations in South Africa" (NWO). *Id.* at 564-65. The investors alleged, *inter alia*, that the defendants "knew or recklessly disregarded that due to high fixed costs, the restructuring of the NWO 'was doomed to fail from the start.'"—and misrepresented this state of affairs to the public to artificially inflate its stock price. *Id.* at 565. Addressing scienter, Judge Marrero held that the motive and opportunity did not support a strong inference of fraudulent intent. *Id.* at 570-71. He then turned to conscious misbehavior or recklessness and summarized the allegations: "In essence, the [Complaint] alleges that Defendants were able to accurately analyze mine profitability and therefore must have known or recklessly disregarded the fact that the NWO restructuring could not succeed." *Id.* at 572. Yet, he observed, the plaintiffs had not offered evidence of any actual reports reviewed by specific DRD defendants indicating that "the NWO restructuring could not succeed." *Id.* Given that the defendants did not actually know, and could not reasonably have been expected to know, that the restructuring would fail, "a strong inference of recklessness in not warranted." *Id.* Judge Marrero analogized the case to *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994), noting that "[t]he pleading strongly suggests that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud." 472 F. Supp. 2d at 573 (quoting *Shields*, 25 F.3d at 1129). To the contrary, he explained, "[t]he NWO was a key DRD asset and a company that does everything it can in an effort to make that asset sustainable should not be charged with recklessness unless it is clear the endeavor could not possibly succeed." *Id.* Accordingly, "[t]hat it was risky, imprudent or even negligent to attempt to sustain the NWO during the Class Period does not equal recklessness." *Id.*

24

**C.**     **§ 20(a) "Control Person" Liability**

Section 20(a) of the Securities Exchange Act of 1934 provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "A violation of Exchange Act Section 20(a) must be predicated on an underlying primary violation."  *Frederick v. Mechel OAO*, 475 F. App'x 353, 357 (2d Cir. 2012). Thus, if the Consolidated Securities Class Action Complaint in this case inadequately alleges scienter, "its allegations of control-person liability also fail."  *Id.* (citation omitted); *accord Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 139 (2d Cir. 2011) ("Having concluded that Wilson failed to state a claim for any primary violation of the securities laws, we affirm the district court's dismissal of his Section 20(a) claim alleging that Merrill Lynch & Co. is liable as a controlling person." (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

**III.     Application of Law to Facts**

**A.     Scienter**

**1.     Motive and Opportunity**

In their opposition to the motion to dismiss, Plaintiffs identify three bases for a strong inference of scienter under a "motive and opportunity" theory:  "([1]) Defendants touted Agnico as a growth company to boost its stock price, raise capital, and acquire other companies; ([2]) Defendants set unreasonably aggressive goals and tied them to compensation; and ([3]) the defendants were awarded tens of millions in incentive compensation which was directly tied to the Agnico's stock price."  (Dkt. No. 59, at 29.)  As a matter of law, Plaintiffs' second and third

alleged bases for motive—stretch targets tied to compensation and incentive compensation tied to Agnico stock price—do not succeed.  *See Kalnit*, 264 F.3d at 139; *Acito*, 47 F.3d at 54

  Plaintiffs' more promising argument focuses on Agnico's aggressive growth strategy, which led Agnico to acquire or announce its intent to acquire interests in five new mining ventures in 2010 and 2011.  In Plaintiffs' view, these acquisitions generated a particularized need to raise capital throughout the Class Period; specifically, Agnico allegedly "took pains to keep itself highly liquid for such acquisitions, filing a base prospectus for an offering of up to $500 million, restating a $1.2 billion credit facility, and entering into a $600 million private placement note offering to reduce amounts outstanding on the Company's credit lines."  (Compl. at ¶ 11.)  In sum, Plaintiffs allege that Agnico's need to generate capital, maintain liquidity, and secure high stock value for acquisitions throughout the Class Period created motive for fraud.

  Although "the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter," *Rothman*, 220 F.3d at 93, Plaintiffs have not pleaded sufficient facts to support a strong inference of fraudulent intent.  This conclusion follows from the fact that Plaintiffs allege motive to conceal or misrepresent problems at Goldex in a very general manner, referring broadly to five acquisitions over a two-year period without alleging facts that specifically connect the alleged pattern of concealment and misrepresentation to the particular transactions.  *See ECA*, 553 F.3d at 201.  Rather, the alleged connection consists in significant part of a desire across the Class Period to maintain an appearance of corporate profitability, secure a high credit rating, and keep share value high.  *See S. Cherry*, 573 F.3d at 109; *Ganino*, 228 F.3d at 170; *cf. Geiger v. Solomon-Page Group, Ltd.*, 933 F. Supp. 1180, 1189 (S.D.N.Y. 1996) ("As the defendants correctly observe, however, a company issuing its stock to the public always has a generalized motive to ensure the success of the issue and to raise as much

26

money as possible."). Thus, the motive alleged by Plaintiffs boils down to a description of the methods by which Agnico pursued its business strategy and economic self-interest. *See Chill*, 101 F.3d at 238. Indeed, these ordinary motives for an expanding corporation to facilitate otherwise routine mergers and acquisitions may demonstrate a "laudable desire . . . to protect shareholder investments," rather than an intent to defraud shareholders. *DRDGOLD*, 472 F. Supp. 2d at 571; *accord Rombach*, 355 F.3d at 177. The desire to inflate the value of stock price to secure more favorable terms in stock-for-stock transactions is thus too general a motive to establish scienter in securities fraud cases. *See Leventhal*, 48 F. Supp. 2d at 115.

Plaintiffs' slight specification of this general, acquisition-based motive runs aground when tested by common sense. During the Class Period, Agnico enjoyed a $1.2 billion credit facility and maintained operations throughout the world. Three of the five acquisitions that Plaintiffs describe in their complaint apparently involved relatively small cost for a company of Agnico's resources: $1 million for Western Troy Capital, $35 million for Queenston Mining Inc., and C$70 million for Rubicon Mineral Corp. (Compl. at ¶ 193.)[3] The fourth acquisition was Grayd Resource Corp. *Id.*[4] This acquisition occurred on October 13, 2011. When Agnico stock value dropped after the October 19, 2011 disclosure, Agnico drew upon its cash reserves to increase its cash offer from $92 million to $183 million. (Def. Ex. I.) If there was a connection between a fraud that began in early 2010 and this October 2011 transaction, it would not seem reasonable for Agnico to have announced its shut-down of Goldex on the eve of the closing of the deal. Further, the Grayd deal relied upon stock only for partial consideration; when its stock

---

[3] Regardless, Plaintiffs allege no facts specific to any of these acquisitions sufficient to support the conclusion that Defendants were motivated to commit fraud.

[4] Plaintiffs offer no information about the fifth acquisition involving Complex Minerals Corp.

value dropped, Agnico soon arranged to pay the difference in cash.  Plaintiffs allege no facts

demonstrating that Agnico met with any difficulty in financing these five acquisitions, that

Agnico lacked sufficient cash to avoid use of stock for partial consideration in these deals, or that

Defendants understood unfolding developments at Goldex to constitute a threat to the

acquisitions.  *See Vivendi*, 381 F. Supp. 2d at 185 (noting that scienter may be imputed where

motive existed to inflate stock value to effectuate a "*specific* transaction that would not otherwise

be possible without fraudulently inflating stock prices" (emphasis added)).  Thus, Plaintiffs have

failed to allege facts that support a strong inference of scienter on the basis of motive and

opportunity.

### 2.        Conscious Misbehavior or Recklessness

"Where motive is not apparent, it is still possible to plead scienter by identifying

circumstances indicating conscious behavior by the defendant, though the strength of the

circumstantial allegations must be correspondingly greater."  *Kalnit*, 264 F.3d at 142.  Plaintiffs

offer a three-step argument:  (1) Defendants actually possessed knowledge of the problems at

Goldex throughout the Class Period; (2) Defendants should be presumed to have possessed

knowledge of the problems at Goldex throughout the Class Period; and (3) Defendants' public

statements about Goldex and Agnico's future were contradicted by this private knowledge.  In

sum, Plaintiffs argue that Defendants actually knew (or should have known) information about

Goldex that they deliberately or recklessly failed to disclose.  This argument does not succeed.

Emphasizing that Boyd and Scherkus treated Goldex with special solicitude, and that

these officials were therefore particularly likely to have been aware of facts on the ground

pertaining to Goldex, Plaintiffs allege that Defendants knew or should have known the following

facts prior to the initial disclosure on July 27, 2011 of certain problems at Goldex:

- The March 2010 mega blast unexpectedly hit a shear zone, triggering a drop in the local water table and microseismic activity in the local bedrock

- Residents of Val d'Or experienced a variety of water-related problems related to a drop in the local water table, ultimately leading Goldex to arrange for affected property owners to be connected to alternative water supplies

- Ground subsidence issues near Goldex manifested in visible ways, including damage to infrastructure and electrical equipment that required Agnico to hire outside contractors and introduce external structural supports

- A highway near Goldex experienced periodic closures

- The commencement, with government approval, of remediation efforts to alleviate subsidence at Goldex—and the eventual failure of these efforts[5]

- Statements by Agnico officials at a neighborhood council meeting acknowledging subsidence issues and communication by Agnico officials with utilities companies

- The purchase of properties near Goldex in Val d'Or due to structural and water-related problems associated with subsidence

- Heightened difficulty and cost in operating Goldex due to subsidence-associated infrastructural damage to Agnico-owned and other local properties

- An inability to pass drills through the rock, suggesting poor rock quality[6]

Plaintiffs argue that it would have been reckless—or deliberately fraudulent—for Defendants to make certain public statements while in possession of this knowledge.  These statements include Defendants' repeated references to "steady state" operations at Goldex, forecasts concerning

---

[5] Plaintiffs allege that these remediation efforts failed within several weeks and that Defendants would or should have been aware of that prompt failure.

[6] Plaintiffs repeatedly gesture toward a statement by Goldex's Assistant General Manger on October 19, 2011 that Goldex "employees have been aware of this rather delicate situation for a year now."  This statement is too ambiguous to support Plaintiffs' allegations of scienter—or, at least, to contribute to a strong inference thereof.  The Assistant General Manger may have been referring to knowledge of a possible closure of the mine, a drop in the mine's performance, and safety issues at the mine, but it seems far more likely in context that he was referring to the general issues of subsidence and remediation that admittedly were known to Defendants.

Goldex's likely "life of mine," descriptions of anticipated expansions in Agnico's gold reserves, and emphases on exploration and extrapolation activities.  Turning to the July 27, 2011 press release and accompanying conference call, Plaintiffs focus on Defendant's public statements indicating that "flow rates have been controlled," remediation would be a "one-time item," Agnico expected to deliver "a strong second half operationally," the results of remediation were initially promising, and the water table and orebody were not in jeopardy.  Plaintiffs also take issue with the September 8, 2011 technical update and the October 11, 2011 press release.

The requisite strong inference of scienter, which must be stronger than usual in this case because Plaintiffs do not adequately allege motive, hinges on a finding that Defendants' conduct represented an "extreme departure from the standards of ordinary care." *Kalnit*, 264 F.3d at 142. Plaintiffs astutely disown the argument that Defendants are liable because Goldex *did* eventually shut down.  (Dkt. No. 59, at 32.)  It is a familiar rule, after all, that the securities laws do not recognize "fraud by hindsight." *Novak*, 216 F.3d at 309.  Rather, the gravamen of Plaintiffs' complaint is that Defendants should have disclosed some or all of this information to the investing public sooner than July 27, 2011 and that Defendants' public statements were misleading in light of available information.  In other words, Defendants actually or recklessly lied to the public while concealing information and hoping the situation at Goldex would resolve itself.  Allegations of this sort may support an inference of scienter in securities fraud cases:

> The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble . . . .  It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (Posner, J.)

Defendants devote some energy to disputing Plaintiffs' allegations that Defendants actually possessed or should have possessed the above-referenced information.  The Court need not address those arguments, since the essential flaw in Plaintiffs' position is that it would impose too high a burden of clairvoyance and continuous disclosure on corporate officials.

Rather than claim that Defendants should have known that Goldex would ultimately close, Plaintiffs claim that Defendants manifested fraudulent intent either by (1) recklessly failing to recognize and disclose the significance of the information in their possession or (2) deliberately choosing not to reveal information about emerging risks at Goldex in their public statements about the mine.  The first of these arguments is essentially a subtler version of the familiar "fraud by hindsight" theory.  The second boils down to an insistence that only fraudulent intent would explain Defendants' choice not to make greater and more continuous disclosure.

### a)        Fraud by Hindsight

The strongest inference to be drawn from Plaintiffs' facts is that Defendants were not aware until October 2011 that the problems at Goldex were of sufficient gravity to threaten Goldex's economic viability or Agnico's economic future.  Plaintiffs' argument that it would have been reckless for Defendants not to appreciate and publicly disclose the significance of these developments does not persuade.  Although a gamble that bad news will eventually be obviated by a change in circumstances may in some cases rise to the level of recklessness, *Makor Issues*, 513 F.3d at 710, the facts alleged in his case most strongly support the inference that Defendants reasonably weighed the level of risk entailed by available information and believed that it did not rise to the level of a gamble they were obliged to disclose to the investing public.  Only adjusted by hindsight does the risk appear so significant.  *See Novak*, 216 F.3d at 309

("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.").

Plaintiffs allege no facts suggesting that Defendants knew or should have known prior to October 2011 that any safety or structural risks associated with the water flow generated by the March 2010 blast would—or even *might*—require suspension (or diminution) of mining efforts at Goldex.  Nor do Plaintiffs allege any specific facts demonstrating that water-related issues meaningfully increased the cost of operations at Goldex, decreased productivity at Goldex, or in any other respect actually impacted Goldex's functioning, such that it would have been reckless or actually false for Defendants to publicly express confidence in Goldex's contemporaneous and future productivity.[7]  Rather, Plaintiffs base their allegations of scienter almost exclusively on Defendants' knowledge of certain observable surface conditions—principally subsidence and damage to infrastructure at (and near) Goldex related either to subsidence or to a drop in the local water table.[8]  But "[k]nowing of 'problems,' which are common, differs from knowing that a facility must be closed . . . ."  *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 955 (7th Cir. 2012) (rejecting argument that the defendants should have announced quality-control problems, which are common, in an earlier disclosure).

Thus, Defendants' knowledge that water had been seeping into the mine for "the last two years," that consultants had been hired and regulatory approval sought to undertake remediation

---

[7] To the contrary, Plaintiffs do not dispute the accuracy of repeated public disclosures in which Defendants described the continued success of Goldex operations.

[8] Plaintiffs do not allege that Defendants immediately learned the results of the August 23, 2011 investigation, which were only reported after the Class Period—on October 25, 2011—and described more serious conditions that threatened the integrity of the mine.  Further, although the report notes that "[t]he company could not answer the question if the surface foundation was stable or if there was a risk of collapse," this language refers to a risk of collapse on the surface of the mine, which would pose qualitatively different safety risks than a collapse in the mine.

efforts, and that local, surface-level infrastructure had sustained some damage does not support a strong inference of recklessness.  In light of Goldex's continued and successful operations, the lack of expert advice indicating a threat of diminished productivity or closure, and the lack of such feedback from investigating regulators, Defendants' lack of "clairvoyan[ce]" with respect to the "material facts reasonably available to them" does not support a strong inference of recklessness.  *Novak*, 216 F.3d at 309; *see also id.* ("[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects."); *Slayton*, 604 F.3d at 776 (noting plaintiffs failed to evidence a contention that defendants were unreasonable in believing—before a full risk assessment—that losses would not be "comparably large"); *Shields*, 25 F.3d at 1129 ("[D]efendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud."); *cf. DRDGOLD*, 472 F. Supp. 2d at 573 ("[A] company that does everything it can in an effort to make that asset sustainable should not be charged with recklessness unless it clear the endeavor could not possibly succeed."). Indeed, Agnico's own consultants had adopted two different views of how to ameliorate the subsidence issue at Goldex, resulting in an "ongoing process" which produced results that by Plaintiffs' own account Boyd and Scherkus found surprising.  (Compl. at ¶ 172.)

Further, Plaintiffs allege certain facts inconsistent with their account of recklessness-based scienter.  First, Plaintiffs note that Agnico won safety awards and acknowledge that Defendants voluntarily suspended operations at Goldex almost immediately upon receiving the October 2011 expert advice—which, even on Plaintiffs' account, constituted the *first* expert opinion expressly recommending mine closure.  Defendants' apparent concern for the safety of their workers, demonstrated by their quick action and by the fact that they hired numerous

experts to prepare reports on mine safety, are in some tension with the inference that Defendants

knew (or should have known) of a potentially serious threat to mine safety and ignored it for

over eighteen months.  Second, if Defendants knew that the mine structure at Goldex had been

imperiled by the after-effects of the March 2010 mega blast, it would not have been reasonable

for them to have conducted a second blast in March 2011—an anomaly that Plaintiffs do not

address.  Finally, in a similar vein, the fact that Defendants continued to invest significant

resources in expansion and remediation of Goldex throughout the Class Period—even after they

allegedly learned (or should have learned) of significant risks—militates against a finding of

scienter.

### b)    Continuous Disclosure

In light of the Court's conclusion that Defendants did not act recklessly in believing that

Goldex's economic prospects were not jeopardized by the evolving situation, Plaintiffs' effort to

ground scienter on the argument that Defendants made public statements contradicted by their

own data must fail.  In the alternative, Plaintiffs might argue that these risk calculations should

not have been addressed secretly and that Defendants revealed fraudulent intent by declining to

disclose to the investing public more information about Goldex.

This argument, however, would take too broad a view of the applicable law.  As Chief

Justice Easterbrook has explained:  "Taking the time necessary to get things right is both proper

and lawful.  Managers cannot tell lies but are entitled to investigate for a reasonable time, until

they have a full story to reveal."  *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 761 (7th Cir.

2007) (citation omitted); *cf. Acito*, 47 F.3d at 51 (finding absence of scienter where defendant

corporation waited a full month before disclosing decision to shut down a factory).  This view

also prevails in the Second Circuit.  As Judge Katzmann explained in *Slayton*, where "defendants

34

engag[e] in a good-faith process to inform themselves and the public of the risks" and "[o]rder[] an investigation as soon as they learn[ of a potentially serious problem]," the inference of scienter can be weakened rather than strengthened.  604 F.3d at 777.

Here, Defendants were not obliged to provide continuous disclosure regarding developments at Goldex, and were entitled to devote a reasonable amount of time to investigation and remediation before disclosing an assessment of the Goldex situation any gloomier than that contained in its July and October 2011 disclosures.

### c)   Conclusion

The inference of scienter in this case is not "strong" and is less compelling than plausible alternative inferences concerning Defendants' intent.[9]  Thus, Defendants' motion to dismiss the securities fraud claims brought pursuant to § 10(b) must be granted.

### B.   Control Person Liability

Because the Court has dismissed the § 10(b) claims in this case, there is no longer a primary violation upon which the § 20(a) claims might be predicated.  Accordingly, Defendants' motion to dismiss Plaintiffs' claim brought pursuant to § 20(a) must be granted.  *See Frederick*, 475 F. App'x at 357; *First Jersey Sec*, 101 F.3d at 1472.

### C.   Leave to Replead

Plaintiffs request leave to address any pleading deficiencies in an amended complaint, in the event the Court finds the Complaint deficient.  "While Rule 15(a)  provides that leave to amend shall be freely given when justice so requires, the Court has broad discretion in deciding

---

[9] Plaintiffs also point to the allegedly suspicious resignation of Scherkus shortly after the October 2011 disclosures as a basis for inferring scienter.  Taken together with other facts, resignation may contribute to a strong inference of scienter.  *See, e.g.*, *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009).  Here, however, the absence of the traditional bases for such an inference renders this single resignation too slender a reed to support scienter.

whether or not to grant such a request." *St. Clair Shores Gen. Employees Ret. Sys. v. Eibeler*,

745 F. Supp. 2d 303, 316 (S.D.N.Y. 2010) (Sullivan, J.) (citations and quotation marks omitted).

"Factors that are relevant to the exercise of the Court's discretion include: (1) the presence of bad

faith, dilatory motives, or undue delay on the part of the movant; (2) the potential for prejudice to

an opposing party; and (3) whether the sought-after amendment would be futile." *Id.* (citations

omitted).  "An amendment to a pleading is futile if the proposed claim could not withstand a

motion to dismiss pursuant to [Rule] 12(b)(6)." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d

243, 258 (2d Cir. 2002).  As Judge Sullivan has explained:

> Some courts in this District have required a plaintiff to file a copy of the proposed
> amended pleading in order to demonstrate that Rule 15(a) relief is appropriate.  At
> the very least, a party seeking leave to amend must provide some indication of the
> substance of the contemplated amendment in order to allow the Court to apply the
> standards governing Rule 15(a).  Put simply, in the absence of any identification
> of how a further amendment would improve upon the Complaint, leave to amend
> must be denied as futile.

*St. Clair Shores*, 745 F. Supp. 2d at 316.

Here, although Plaintiffs have not chosen to amend their pleadings at a prior point in this

litigation, they had, and declined to exercise, an opportunity to do so when Defendants filed their

motion to dismiss.  Further, Plaintiffs request leave to amend in a single sentence at the end of

their brief, without any suggestion of what changes such amendment might effect.  As a result,

the Court has "no inkling of what [their] amendment might look like or what additional facts

may entitle [them] to relief." *Id.*  "Rule 15(a) is not a shield against dismissal to be invoked as

either a makeweight or a fallback position in response to a dispositive motion." *DeBlasio v.*

*Merrill Lynch & Co., Inc.*, No. 07 Civ. 0318, 2009 WL 2242605, at *41 (S.D.N.Y. July 27,

2009).  Therefore, the Court concludes that granting leave to amend the Complaint is

inappropriate on grounds of futility.  Plaintiffs' request for leave to amend is denied.

36

**IV.**    **Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.

The Clerk of Court is directed to close the motion at Dkt. No. 55 and terminate this case.


SO ORDERED.


Dated: New York, New York
       January 14, 2013

                                              _____
                                              J. PAUL OETKEN
                                              United States District Judge